The first case on today's docket is Clause 22-60442, the Atlantic Group v. NLRB. Is the appellant ready to proceed? Yes, Your Honor. You may proceed. Good afternoon, Your Honors, and may it please the Court. There are three unfair labor practice findings by the National Labor Relations Board that are before this Court on petition for review. I plan to start with the charge by IBEW Local 220 contending that the Atlantic Group changed terms and conditions of employment relating to layoffs when, in July 2020, it laid off employees Joe Mendez and David Smith. Respondents' position is that on the scant record developed at trial in this case and under NLRB precedent, enforcement of the Board's decision and order should be denied. The unilateral change charge under Section 5 of the Act arises under very narrow circumstances, yet it raises an issue of great significance to ongoing business operations at a newly unionized company that has no collective bargaining agreement yet. The Board erred in two fundamental respects. First, Counsel for the General Counsel presented no evidence about terms and conditions of employment relating to job security that were in place before the union came on the scene. The union, I'm sorry, the NLRB Counsel for the General Counsel called one witness. That witness was Michael Murphy, who is an employee of IBEW Local 220. Mr. Murphy did not testify at all about preexisting terms and conditions, not a word, nor did Mr. Murphy on rebuttal to testimony by site manager Kevin Crabtree. Mr. Murphy did not address Mr. Crabtree's testimony about the nature of the Atlantic Group's business as a supplemental staffing provider to a third party, nor did Mr. Murphy address the testimony by Mr. Crabtree about employees' knowledge and understanding coming on board at the Atlantic Group that layoff was an inherent possibility, given the nature of the business. There is not a single document in evidence from Counsel for the General Counsel addressing terms at the Atlantic Group prior to the layoffs of Mr. Mendez and Mr. Smith. Mr. Mendez and Mr. Smith weren't even called to testify. There is no evidence to show what Mr. Mendez and Mr. Smith or any other employees of the Atlantic Group at Comanche Peak understood regarding the possibility of layoffs, other than the affirmative testimony from the Atlantic Group that they were well aware that layoff was a possibility, if not a probability. Employee expectations about what their terms and conditions are, what might be changed, what might not be changed, is material to determining whether there has been a unilateral change. That's clear from the board's own cases, Mike Sells and CPL Linwood, which are cited in our briefs. A predicate to proving change in terms and conditions of employment necessarily has to be establishing what the terms and conditions of employment were. Counsel for the General Counsel did not do that here, and Counsel for the General Counsel did not reach first base. Now, second on the Section 885 unilateral change charge, the board erred in rejecting or not rejecting, just flat out dismissing affirmative and uncontroverted evidence about the Atlantic Group's prior terms and conditions of employment and about layoffs that occurred during the first few months that the Atlantic Group was on scene at Comanche Peak. Evidence in the record is clear that inherent in the nature of the Atlantic Group's business, every employee, including management, Mr. Crabtree testified to that, could anticipate layoff or outright termination due to fluctuating demands for labor from the customer, that being the operator of the Comanche Peak Nuclear Power Plant. Evidence in the record is abundantly clear that every employee hired by the Atlantic Group acknowledged in writing that they were subject to layoff. The employees expressly confirmed. I'm listening, but I guess I thought the NLRB order had to do with some determination that these employees were laid off without meeting the requirement that there was some consultation, some meeting with the union prior to a layoff. Wasn't that part of? That's the contention. Our position is, and I think it's well supported in the NLRB's own precedent, is that it works this way. When a new union comes into representation, terms and conditions as they existed go on. The union can request bargaining for a plenary collective bargaining agreement to change the status quo, and that is, in fact, what happened here. But the fact is that pending that first contract, the terms and conditions are what the terms and conditions were. And in that connection, you maintain that there are employees that have been laid off. Absolutely. The same as when you laid off Mendez and Smith. Absolutely. It's a matter of both of the hiring agreements coming into this unique type of business, but also the events that actually occurred. And you offered three or four examples of employees. That we did. All the events that occurred in this case occurred between January 30, 2020, when the Atlantic Group began operations at Comanche Peak, and July 2020, when Mr. Mendez and Mr. Smith were laid off. And during that brief period, there were four individuals laid off in two different occurrences. Local 220 did not challenge any of those layoffs. Administrative Law Judge Rosas expressly found that the Atlantic Group had a past practice of layoffs. I'll quote from the ALJ decision record on appeal, page 1090. Respondent had a past practice of laying off employees, as it did on April 6 and May 13, due to lack of work. In dissent to the board majority, Member Kaplan also determined that the Atlantic Group had a past practice of layoffs, quote, similar in kind and degree to the Mendez and Smith layoffs. Very simply, Your Honors. But the majority, as I understand the order, the majority said that those layoffs were COVID-related and were very much unlike any layoff involving any other employees. The standard is similar in kind and degree, and these were all similar in kind and degree. The Lake employees were laid off during the COVID pandemic, as was everybody for that matter, because the operator, Lumina, pulled that work away, as it pulled the work away for Joe Ortiz, as it pulled the work away for Mr. Mendez and for Mr. Smith. Fact is, operator pulled the work away. The Atlantic Group had no work that could bill a customer for, so the employees were laid off. All six layoffs are precisely similar in kind and degree. So you're likening a layoff related to a delay or a lack of a projected plan to the layoffs that are related to COVID or to a global pandemic, you're saying those are one and the same? Absolutely they are. Lack of work is lack of work, and a layoff is a layoff, similar in kind and degree. The COVID point in all candor, I think, is totally contrived. It's not a valid distinction. And in any event, the practice that occurred is consistent with what the company's policies were, with what the employees signed on to and acknowledged, and with what occurred also with Mr. Ortiz, which no one says was at all attributable in any respect to COVID. It really comes down to this. The current board at the NLRB does not favor the precedent it inherited from prior administrations, and instead of applying the law to the facts in this case, it both relieved counsel for the general counsel of its burden of proof to establish the status quo ante, and it disregarded both uncontroverted evidence and findings of fact by the administrative law judge. Going back to the big picture of collective bargaining, Local 220 was free to negotiate layoff language into a collective bargaining agreement, and that, in fact, happened in late 2020 and the first few months of 2021 when the parties got to the table and hammered out a collective bargaining agreement. But pending a first collective bargaining agreement, the terms and conditions of employment necessarily have to be those that were in place before the union came on the scene. You can't operate in a vacuum, and that is effectively the board's position in this case, that there are no terms and conditions. There is no practice to follow. An employer would have to negotiate every single action it intended to take with a new union, step by step by step, day by day by day, instead of sitting down at a table and negotiating a plenary collective bargaining agreement, which actually materialized, in this case, after the certification was affirmed by the National Labor Relations Board. Turning briefly, Your Honors, to the Section 8A1 coercive speech claim, the Atlantic Group's principal points are twofold. One... Let me ask you a question about the effect of the order that was entered. What is the operative effect today of that award, of the decision of the board? You were talking about a series of events at the outset. We're well down the road now. Where are we in terms of the current impact upon your business? Well, we have a collective bargaining agreement. The company has a good relationship with IBEW Local 220. I candidly, on that score, don't know why we're here, because all the company did was make sure that the unit that was certified by the regional director was an appropriate unit, and pending that determination, it could not engage in collective bargaining with the union. We're dealing with a slice of time, a fairly small piece of time, where these things occurred, et cetera. Now everybody's going forward in a peaceful work environment in terms of the union management relationship. That's very true. We're dealing with a point of time in the past. So what is the... And we were here litigating this earlier event, history. What does that history do? How are you impacted by that history? Well, we were impacted by that history. We were impacted solely in the respect that we have unfair labor practice charges we have to defend. The company and the union actually have a good relationship. They have a collective bargaining agreement. You will notice that the union is not an intervener in this case. The impact was, in effect, administrative litigation. Once the unit was certified and approved by the NLRB in Washington, D.C., everybody got together and negotiated a collective bargaining agreement. And that's the way it's supposed to be. And that's the way it worked out here. If I were a stranger to this whole enterprise, I would say that they were passed to articulate no damage occurred. There's no recovery of money damages or any restitution. Unless it's some sort of name-cleansing practice, the cases essentially move. I would accept that it's not moved, but just looking at it as I've described it, there's a strong suggestion that this is a historical thing that's gone away. I hesitate to make the point, but there is one open issue, and that, of course, would be back pay for Mr. Mendez and Mr. Smith. That's the only aspect of this case that has monetary significance. What is it? What it boils down to? Is that one issue? That would be the only issue with monetary significance. The other remedies you'd be looking at are effectively notice posting. Notice posting, that would be the only other remedy. Posting an NLRB-published notice that says thou shalt not. That would be it. I see that I'm running out of time. I would like to mention very quickly, counsel for the general counsel made a strident opening statement when she promised evidence of an aggressive anti-union campaign full of threats, intimidation, and coercive conduct. That never materialized. If you compare counsel for the general counsel's opening statement to the evidence presented at trial, it is a tale of two different cases. There is absolutely no evidence in this record that the Atlantic Group is anti-union or as a company engaged in any conduct to discourage unionization. I'm out of time. Judge Higginbotham, Judge Graves, Judge Douglas, thank you. It's always an honor to be here. Thank you, counsel. Mr. Seid. Good afternoon, Your Honor. May it please the Court, David Seid for the Labor Board. Three initial points regarding the layoff of the two-unit employees. First, when an employer lays off employees, it is, as this Court held over 40 years ago in the W.R. Grace case and the Chalmers case cited in the Board's brief, which the company completely ignores, is in and of itself a change to the status quo, and therefore the absence of notice to the union before implementing the layoffs is generally unlawful. The company suggests that the Board in recent decisions has backed off of that principle. Very simply here, even the dissent, the disagreeing and evidentiary grounds of the majority, didn't find that there was any improper shifting of the burden to the company to establish a past practice. And in the Bemis case cited in the Board's brief, which issued after the three or four cases that the company cites to, a Board comprised of not just Member Kaplan but two other presidential appointees of President Trump unanimously adopted an administrative law judge's decision in that Bemis case acknowledging that a layoff of employees is a change to the status quo and that the employer therefore has the burden to establish a past practice. And to establish a past practice means two parts. First, that there are prior layoffs that are similar in kind and that they occur on a regular frequency  Here, the Board reasonably found that there is insufficient evidence to establish a past practice and although the company protests, it is not before this Court established that the record compels otherwise. Specifically, with respect to the Lake employees, the Board started with the premise, again, that not all layoffs are exactly the same. In a case that, again, the company, as it has tended to do throughout its briefing, ignores the Board's reliance on the Champion Home Builders case. Well, did you accept that a loss of business, of the company itself, would be a basis for layoffs? Your Honor, what the Board found here was simply that a . . . I understand, but the company . . . Why is it that the practice will say, look, you have this job, but this is an episodic business enterprise and when we don't have the business, the company doesn't have the business, then you get laid off. The response to that is, well, that may be a practice, but this was because of the virus. Is that . . . Correct, Your Honor. What difference does it make whether it's the virus or not? You could define this in terms of, well, if the layoffs are because we don't have the work, then that's a business practice. And you understand that this is an on-and-off business. Correct, Your Honor. And that is the position I was taking by the dissent, is essentially that a layoff is a layoff and it doesn't matter what the reason for the layoff is. And the Board majority, very reasonably, following established Board precedent, that similar in kind doesn't simply mean that any layoff is equal. Otherwise, the similar in kind would basically have no purpose. And the Board has drawn a distinction between the types of layoffs, for example, in the Champion Home Builders case. But you agree, don't you, that the layoffs with the Lake employees were related to a lack of people coming into facilities because of COVID. So there wasn't any work for them to do because there weren't any visitors to these facilities. That's correct. That's a lack of work. It is. And then when they laid off Mendez and Smith, they laid them off because of a lack of work. Your Honor, they laid them off for the reason that a project was delayed. A normal ebb and flow of the business, which could be expected. And what the Board has reasonably found here is that COVID presented some very extraordinary circumstances. In fact, I think company counsel in his opening argument referred to essentially that during this time period, everybody was getting laid off. And at the hearing, Crabtree testified that this was a very uncertain time period. Whether or not everybody was getting laid off or only a couple of people were getting laid off, they were being laid off because there wasn't any work. That is correct, Your Honor. But again, the Board very reasonably is drawing a distinction that not all layoffs are equal. And in the context of is there a past practice and would employees have an expectation that there will be layoffs based on a situation that happened during COVID? And these were individuals where the employer had a contract illuminate for the entire year to service the lake. And the layoff notices themselves very specifically made reference to COVID. And COVID was a situation that was done at the direction of company officials that COVID was listed. The company says that was simply to try and help them gain unemployment benefits. The fact remains that the company itself recognized that COVID presented some very unique situations and that that is why COVID was listed on the layoff form, which it was not listed for. It's unique only in the sense of the cause of a loss, right? It's unique only in the sense of a COVID. Suppose you had a tornado that whipped through the building. It's an apathetic event by nature. No business. Labor violation, layoff. In the context of whether an employer is establishing a past practice, arguably in a situation where there is an extreme event that is simply not a typical situation where an employer may need to layoff employees, that the board could look at it differently. For example, in the Champion Home Builders case, the board drew a distinction between layoffs that were due to a plant closure and layoffs that were due to a lack of work. And here, again, given what was in the board very reasonably found as very unique circumstances it had in other cases it's decided in respect to COVID, given that the employer specifically noted COVID on the form, given that Crabtree himself testified that this was essentially a very unusual circumstance, the board can very reasonably look at the late employees and find as it did here that they were not similar in kind or that employees would expect a layoff as far as a past practice of laying people off based on a lack of work. And again, this is not to say that the employer would not have been able to lay them off. It's simply that they needed, it's a change in the status quo, and that they needed to provide the union with a notice to bargain. And that notice could, in giving them that notice, maybe there's some alternative to the layoffs. And if they can't avoid the layoffs, then how is it going to be conducted? Is it going to be based on seniority? Will there be any recall rates, any severance? Those are all the types of things that get brought up.  But according to the law, if they go back and establish that it was a past practice that was in place and that the layoff of Ortiz and Mendez was in keeping with the past practice, then they're okay. If the company carried its burden, again, the board reasonably found that it didn't. And I would also note, the company counsel made a reference, and it's in their briefs, and the board responded in its brief. See, Crabtree testified that layoffs are inherent in the type of work that the company does. And yet, when he was asked, and this is a record appendix, pages 120 to 122, well, have you ever been laid off for a lack of work? He says no, that he was only laid off one time when a contract ended. So even in his general testimony, he wasn't able to establish a situation where the company was laying off people in a normal part of its business and as a regular occurrence. So you're arguing, in essence, that if you had had a contract, they would have to bargain over what to do with COVID? Well, Your Honor, the— If COVID's here, we can't lay you off without bargaining with you. Sure. And the layoff of the Lake employees itself isn't an issue as being unlawful, but there were many cases that came that the board's regions addressed, and I know there were some cases that the board itself has now issued. An employer, when COVID hit, does have an ability to assert an economic exigency, that something just happened so quickly and unexpectedly that there wasn't time to bargain with the union. And certainly, I can't cite specific cases to the court, but there are situations where, yes, the board, in its long history, not just with COVID, but in many other situations, does find that there's an economic exigency that would excuse an employer's conduct where they can act immediately and do layoffs without notice. And so here, the layoffs of the Lake employees aren't an issue, only in the context of whether the board reasonably found that they weren't similar in kind to the layoff of the two union employees. Can you talk a little bit about the standard of review? Excuse me, Your Honor? Can you talk a little bit about the standard of review? The standard of review here is substantial evidence, and the company has to be able to show to this court that the record compels a different result. Not that there could be. I'm not standing here to say that the board's dissenting opinion doesn't have potentially some merit to it. It could be a very reasonable interpretation. But the board very reasonably, in evaluating the evidence, came to a different result. That was a majority decision, and that's entitled to deference, unless this court finds that the record compels a different result, which it certainly doesn't do here because, again, it's consistent not just with the facts. It's consistent with board case law, such as the Champion Home Builders case. It's consistent with other board cases like Northwest Palace, Texas Station, where the board recognized the uniqueness of COVID and the impact it was having on how employers were operating. Unless this court has any other questions, the board would simply ask that this court enforce its order. Thank you, counsel. Rebuttal. May it please the court. David Schlottman on rebuttal for the petitioner in this case. The conversation today is focused almost exclusively on the — actually has focused exclusively on the 8A5 termination charge. And so that's where I'll focus my time. And I want to address the points that counsel for the board just made. The first point was that termination is inherently a change to terms and conditions of employment. Absolutely not the case. I think the first point I would make in response to that is that the board never took that position in its order. If you review the order, the words termination inherently being some special class of employment action that automatically constitutes a unilateral change, that reasoning is nowhere in the order. And so what counsel for the board is asking you to do is to affirm the board's order on a basis that it did not itself come to, which, of course, would be inappropriate under the standard of review. The second point I would make on that is that it's an incorrect statement of the law. If you look at a case that we cited in our brief, it's called 800 River Road. It also goes by Care 1 at New Milford. This is a case where the circumstances were exactly as it was here. There was a newly certified union, and the question was, what is the employer entitled to do under existing terms and conditions under the status quo with respect to discipline? The board in that case said the employer must act consistently with its policy. The disciplinary policy said that if you engage in unsatisfactory conduct or words to that effect, then the company could exercise any measure of discipline up to and including termination of employment. The company found that a couple of employees violated the policy and therefore discretionarily decided to terminate one employee and suspend three others. The board in that case didn't hold the termination of the employee under that discretionary policy was inherently a change that required bargaining. In fact, much to the contrary, the board found in that case that because there was a policy that was the existing status quo when the union came on board, that the company's exercise of discretion to terminate employment was not a change to terms and conditions because it was consistent with the policy which allowed discretion. So the statement that was made just simply is not the case. Termination consistent with existing terms is not a change that requires bargaining. The second point that I would make is that existing terms and conditions can be found in either policy or practice. The board in this case skipped a step by simply finding that termination must have been some sort of change and then skipping straight ahead to past practice. But again, going back to 800 River Road. You're talking about terminations, and I guess I'm thinking about layoffs. I'm using the term interchangeably here in this context, ending employment. I had this conversation already. To me, a layoff means there's some possibility you could be called back. Termination means I don't ever expect to hire you again. But you're saying they mean the same thing. In the specific context in which I was speaking, I was using them interchangeably. But to that point, I think that is an important distinction and one that's actually interesting because if termination and layoff have different meanings, and the board in 800 River Road said you can terminate employees for violating a disciplinary policy and that wasn't a change in terms and conditions, then a layoff where there might be possibility of recall certainly would be a lesson. But you don't lay somebody off as a disciplinary matter, do you? No. No, Your Honor, you wouldn't. And the layoffs were for lack of work, certainly. Going back, though, to past practice, I want to make a few comments on what counsel for the board mentioned. But the distinction that's drawn between the lake workers and the layoffs of Smith and Mendez, it's an artificial distinction, and it advocates a requirement of similarity that the board's own precedent rejects. I think there's one case in particular that's worth reviewing, and it's called Mike sells potato chips. In that case, there is an extended discussion by the board about how similar actions have to be in order to constitute a past practice. And all that's required under the board standard is similar recurrent actions, and certainly that standard meets that. I think another point to draw to is that the board's distinction, the factual finding that there is somehow a difference between COVID or that the layoffs of the lake workers was actually due to COVID is not supported by the record. If you look at the termination paperwork, both the termination paperwork for Smith and Mendez and the lake workers both say D1. D1 means lack of work. That's what it was for both Smith and Mendez and for the lake workers. But did the COVID ones have a designation that they were related to COVID or no? The termination paperwork for the lake workers does have a notation. I can't remember exactly what boxes it might say reason or something to that effect, but it does say laid off due to COVID-19. There was testimony in the record that that was related for purposes of unemployment, basically to assist employees in collecting unemployment sooner. I see I'm out of time. Thank you for your time today. Thank you, counsel. The court will take this matter under advisement when we call the next case.